***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby affirms the Opinion and Award as modified below.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the deputy commissioner hearing and in the Pre-Trial Agreement dated February 28, 2001 as
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter of this action.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. In addition to the other stipulations contained herein, the parties stipulate and agree with respect to the following undisputed facts:
 a. That on or about March 24, 2000, defendant-employer employed more than three employees, and the parties were bound by and subject to the provisions of the North Carolina Workers' Compensation Act. N.C.G.S. § 97-1 et seq.;
 b. That on or about March 24, 2000, there existed between plaintiff and defendant-employer an employee/employer relationship;
 c. That on or about March 24, 2000, employer provided servicing for workers' compensation insurance coverage to its employees through Crawford Company;
 d. That on or about March 24, 2000, plaintiff was employed by employer at an average weekly wage of Six Hundred Forty-two and 50/100 Dollars ($642.50) resulting in a compensation rate of Four Hundred Twenty-eight and 35/100 Dollars ($428.35);
 e. That on or about March 24, 2000, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer, said accident resulting in injury to his cervical spine;
 f. After the injury by accident of Friday, March 24, 2000, plaintiff returned to work for defendant-employer on Monday, March 27, 2000, and worked through April 20, 2000. Plaintiff also worked for defendant-employer on September 11, 2000 and September 12, 2000;
 g. That plaintiff received temporary total disability benefits pursuant to a Form 60 dated May 4, 2000 in a weekly amount of Four Hundred Twenty-eight and 35/100 Dollars ($428.35) from April 22, 2000 until August 25, 2000 as a result of his injury by accident.
4. Documents stipulated into evidence include the following:
 a. Stipulated Exhibit #1 Plaintiff's medical records, March 24, 2000 Accident Report, Plaintiff's Recorded Statement;
 b. Stipulated Exhibit #2 Plaintiff's Response to Defendant's First Set of Interrogatories and Request for Production of Documents to Employee-Plaintiff;
 c. Stipulated Exhibit #3 Seven (7) pieces of correspondence from Greenville Glass Company.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following
 FINDINGS OF FACT
1. At the time of the deputy commissioner hearing, plaintiff was sixty years old and had been employed as a glazier by defendant-employer for approximately five years. Plaintiff had been working in the glass business since 1959. He has a seventh grade education and has trouble reading and writing, but he was able to perform these functions to the extent necessary to perform his work duties in the glass business.
2. On or about March 24, 2000, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer when the vehicle owned by defendant-employer in which he was a passenger was struck from behind by another vehicle while stopped in traffic.
3. Sometime following the motor vehicle accident, plaintiff began to experience pain and stiffness in his neck and shoulders and began suffering from headaches. Plaintiff estimated that he started to feel pain about two weeks following the accident. Because he was experiencing neck and shoulder pain, headaches, and numbness in four fingers, plaintiff sought treatment from Robert McCarthy, D.C., of McCarthy Family Chiropractic in Greenville, North Carolina. Dr. McCarthy first examined plaintiff on April 3, 2000, at which time he noted that plaintiff was experiencing neck and upper back pain. Plaintiff was treated by Dr. McCarthy on thirteen occasions between April 3, 2000, and April 24, 2000, and his course of treatment with Dr. McCarthy, plaintiff continued to experience stiffness and pain.
4. Dr. McCarthy took plaintiff out of work on April 19, 2000, for the remainder of the week, and then on April 20, 2000, on a note written on a Greenville Chiropractic form, Dawn Gurganus from Dr. McCarthy's office took plaintiff out of work until further notice.
5. On April 7, 2000, plaintiff presented to Greenville Health Care Center with neck, muscle pain, and headaches and was diagnosed with whiplash muscle pain and muscle tension headache. Plaintiff was treated with Naprelan and Skelaxin and advised to return if his problems were not improved.
6. Plaintiff returned to the Greenville Health Care Center on April 19, 2000, with continued neck and back pain. Plaintiff demonstrated tenderness across the shoulders and the cervical area with rotation and lateral movement. He was diagnosed with trapezius muscle group musculoskeletal pain due to his injury. Plaintiff was continued on Naprelan and advised to avoid lifting, pushing, and pulling more than ten pounds and to avoid bending and stooping.
7. On April 24, 2000, plaintiff was seen in the Emergency Department of Pitt County Memorial Hospital by Jason Hack, M.D., for headaches. Plaintiff demonstrated midline tenderness in the T- and C-spine areas and diminished strength with left upper and lower extremity flexion and extension. Dr. Hack ordered radiographic studies and a neurological consult. The cervical spine x-ray indicated intervertebral disc space narrowing and osseous foraminal narrowing indicating moderately advanced cervical spondylosis.
8. A neurological consult by Arvo Kanna, M.D., was conducted at the Emergency Department on April 24, 2000, due to plaintiff's complaints of numbness in the left side and headaches. Dr. Kanna noted tightness in the upper back and neck and decreased vibration and pinprick sensation. He diagnosed a cervical strain, took plaintiff out of work for 4 weeks, ordered an MRI, prescribed Elavil and Lortab, and recommended follow up in his office. The cervical spine MRI was performed on May 1, 2000 at MRI of Eastern Carolina in Greenville. The study indicated degenerative changes in the cervical spine with C6-C7 disc bulge and spondylotic foraminal encroachment at several cervical levels.
9. Plaintiff was examined by Dr. Kanna at East Carolina Neurology on May 23, 2000. Dr. Kanna noted that plaintiff delayed treatment in the hopes that he would get better. At the time of the examination plaintiff was still experiencing neck pain, headaches, and upper back pain; along with left upper extremity numbness. Dr. Kanna noted that plaintiff had a limited range of motion of his neck with extension and rotation. Dr. Kanna diagnosed a cervical strain and degenerative changes of the cervical spine with possible left cervical radiculopathy. Dr. Kanna's notes indicate that plaintiff's symptoms were initiated by the accident. Plaintiff was kept out of work for an additional 4 weeks, prescribed Relafen, and referred for physical therapy.
10. On May 30, 2000, plaintiff began physical therapy at Pitt County Memorial Hospital. Following 2 weeks of treatment, plaintiff had made no progress and continued to experience neck and left shoulder pain with numbness of the neck, left lateral shoulder, and fingertips. Plaintiff continued to suffer daily headaches and had experienced no reduction in his pain as a result of the physical therapy or through the use of a TENS unit. Plaintiff was discharged from physical therapy on June 12, 2000, for lack of progress.
11. On June 26, 2000, plaintiff was seen by R. Wayne Cox, M.D., at Physicians East with continued pain in his neck with radiation down the left side and numbness in the left upper extremity. Dr. Cox noted wasting of the trapezius musculature on the left side, decreased strength on the left side, altered sensation in the distribution of C6-C7, and decreased rotation and flexion of the neck. Dr. Cox increased plaintiff's Elavil and continued him on Relafen and Hydrocodone.
12. Plaintiff returned to Dr. Kanna on July 6, 2000, with continued neck and left arm pain. Dr. Kanna noted decreased range of motion of plaintiff's neck with rotation and pain on extension. Dr. Kanna diagnosed plaintiff with continued cervical strain and increased the dosage of his amitriptyline.
13. Plaintiff then returned to Dr. Cox on July 13, 2000. At that time he continued to suffer severe neck pain and numbness with weakness within the arm. Dr. Cox noted decreased reflexes on the left side and wasting of the trapezius and deltoid muscles on the left with numbness on the left side accompanied by radiating pain. Dr. Cox recommended a neurosurgical referral to Dr. Hardy.
14. On July 20, 2000 plaintiff was seen by Scot E. Reeg, M.D., of the Center for Scoliosis and Spinal Surgery. Dr. Reeg noted that plaintiff had suffered persistent headaches since the motor vehicle accident in March. Dr. Reeg's notes also indicate that plaintiff sought medical attention when his symptoms did not improve with time. Dr. Reeg initially diagnosed plaintiff with bilateral C4-C5 and C5-C6 foraminal narrowing, left C6-C7 disc bulge, and cervical degenerative disc disease. He recommended a myelogram, placed plaintiff in a soft cervical collar, and kept him out of work pending the completion of the studies.
15. The cervical myelogram was performed on August 9, 2000, at Eastern Radiologists and indicated moderate spondylosis at C5-C6 and C6-C7. The post-myelogram CT noted moderate spondylosis with bilateral foraminal stenosis and left foraminal narrowing.
16. Plaintiff then returned to Dr. Reeg on August 17, 2000, with neck pain and headaches, along with occasional numbness in the left arm. Dr. Reeg did not feel that surgical treatment was appropriate for plaintiff's condition and injected plaintiff's subacromial process on the left side. Plaintiff was prescribed Ultram and released to the duties of a glass technician with some modification.
17. On August 31, 2000, plaintiff returned to Dr. Cox with continued neck pain and left arm numbness. Dr. Cox noted decreased range of motion and paraspinal spasms on the left side. Dr. Cox recommended that plaintiff undergo additional physical therapy and keep the second-opinion appointment that had been scheduled. Dr. Cox examined plaintiff again on September 13, 2000, for worsening neck pain and continued headaches. Dr. Cox noted cervical spasm and left-sided weakness. Dr. Cox noted that plaintiff was scheduled for an assessment at Duke University Medical Center (Dr. Richardson) on October 30, 2000, and took plaintiff out of work pending that evaluation.
18. Plaintiff was next seen by Dr. Reeg on September 21, 2000, with no improvement and persistent headaches. Plaintiff presented with pain down the left shoulder into the arm with numbness and tingling in the fingers. Dr. Reeg noted that plaintiff was unsuccessful at returning to light-duty work because the duties of the employment aggravated his symptoms. Dr. Reeg noted restricted range of motion in the shoulders and prescribed Phrenilin and temporarily restricted plaintiff to sedentary work with no lifting, pushing, or pulling greater than 10 pounds, no repetitive bending or reaching, no work overhead or above shoulder level or in positions with his neck in an awkward position for the next 6 weeks. Dr. Reeg also noted that plaintiff should be taken out of work pending his second opinion if sedentary work was not available.
19. On October 2, 2000, plaintiff again returned to Dr. Cox with continued headaches and neck pain extending down the left side. Dr. Cox noted that plaintiff sustained a neck injury subsequent to the car accident. On examination Dr. Cox noted paraspinal spasm on the left side and left-sided weakness. Plaintiff was advised to return following his second opinion appointment at Duke.
20. Plaintiff was evaluated by William J. Richardson, M.D., at Duke University Medical Center on October 30, 2000, with headaches, shoulder pain, and numbness in the left hand. Dr. Richardson noted pain with cervical bending and rotation and recommended an EMG-nerve conduction study and facet injections at C4-C5 on the left and ordered lumbar and cervical spine x-rays. The radiographic studies indicated degenerative disc disease of the cervical spine with anterolisthesis of C3 on C4 and C4 on C5 with flexion. Dr. Richardson kept plaintiff out of work pending the completion of his evaluation.
21. Plaintiff returned to Dr. Reeg on December 7, 2000, with neck pain, headaches, and numbness in his arms. Dr. Reeg made arrangements for the electrical diagnostic studies recommended by Dr. Richardson and continued plaintiff's very limited duty.
22. Anthony C. Breuer, M.D. performed the EMG and nerve conduction studies at East Carolina Neurology on January 8, 2001. The test results indicated bilateral median neuropathy and bilateral ulnar neuropathy with no indication of a left cervical radiculopathy. The neuropathy findings are consistent with plaintiff's symptoms and, as explained by Dr. Richardson, would not be associated with the automobile accident. The absence of cervical radiculopathy suggests that plaintiff's spondylosis and disk bulge were not the cause of plaintiff's neurological symptoms, and further suggests that these symptoms are not due to the accident.
23. Dr. Reeg reviewed the EMG studies on January 16, 2001 and did not recommend surgical treatment. On January 19, 2001 Dr. Reeg found plaintiff to be at maximum medical improvement and assigned a three percent (3%) permanent partial impairment rating to plaintiff's cervical spine. Dr. Reeg expressed that plaintiff can return to his previous work for the glass company.
24. Plaintiff returned to Dr. Richardson on February 19, 2001 to review the results of his EMG nerve conduction study that showed a sensorimotor polyneuropathy. Dr. Richardson did not think surgery would benefit plaintiff and recommended continued pain management, including Neurontin and Elavil. He also noted that plaintiff was unlikely to return to any reasonable employment and that plaintiff was disabled as a result of the combination of cervical spondylosis and polyneuropathy.
25. Plaintiff's radiological studies suggest that his spondylosis preexisted the automobile accident, although it may have been nonsymptomatic before the accident.
26. Dr. Richardson testified that plaintiff was totally and permanently disabled and would not return to any form of gainful employment because of two conditions: (1) sensorimotor polyneuropathy, which is most likely secondary to alcohol abuse or was idiopathic; and (2) cervical spondylosis, which was preexisting. Dr. Richardson opined that it was possible that these conditions were aggravated by the motor vehicle accident, but found it was not probable that these conditions were caused or aggravated by the accident because plaintiff gave him a history of symptoms that did not appear until two to three weeks after the accident. Dr. Richardson explained that it was not uncommon for whiplash symptoms to appear a few hours later and even a day later, but three weeks later was unusual. Dr. Richardson, therefore, refused to give an impairment rating for plaintiff's injury from the motor vehicle accident because he has difficulty associating plaintiff's symptoms to that event.
27. Dr. Reeg testified that there is no history of plaintiff suffering from neck pain prior to the accident and that it is certainly possible that the automobile accident sustained by plaintiff could have aggravated his preexisting condition and that the neck pain and headaches that plaintiff suffered corresponded with a rear impact injury such as plaintiff described. Dr. Reeg further testified that any neck pain and headaches due to the cervical spine could be aggravated by the automobile accident.
28. Contrary to the results of the EMG study, Dr. Cox testified to a reasonable degree of medical certainty that the automobile accident resulted in plaintiff's neck and left arm pain. He testified further that plaintiff's headaches were exacerbated by the automobile accident and that the automobile accident most likely aggravated plaintiff's pre-existing spondylosis. It was also Dr. Cox's opinion that plaintiff could not return to work because of neck and left arm pain. Dr. Cox did not see plaintiff until approximately 3 months after the accident and is not an authorized physician.
29. Dr. Reeg released plaintiff to return to work with restrictions on August 17, 2000. Plaintiff was released to the "glass technician" job with additional restrictions of no climbing, overhead work, or lifting more than fifteen to twenty pounds. The job offered to plaintiff in August 2000 was a compilation of duties usually performed by different employees, and was not a separate job. The duties included cutting orders for glass, fixing storm windows and screens, which required plaintiff to lean over to cut the glass, use a sander weighing 10-15 pounds, lift windows weighing 5-10 pounds or more, and lift shower doors weighing 35-40 pounds. Some shower doors could weigh up to 300 pounds.
30. The "glass technician" position offered to plaintiff in August 2000 was a "make work" position created to meet plaintiff's temporary restrictions. This position was offered to plaintiff before he reached maximum medical improvement and thereby the question of suitability of employment after maximum medical improvement is not raised with this employment.
31. Dr. Reeg released plaintiff to sedentary work with temporary restrictions on September 21, 2000. The defendant-employer offered plaintiff a job called "Sedentary Position," which included functions of assisting in answering the phone, taking customer phone orders, taking inventory of plastics, glass, coordinating and assigning outside jobs, compiling lists of material for orders and ordering material and visiting job sites to compile information for estimates and quotations.
32. Upon Dr. Reeg's release of plaintiff to work, defendants filed a Form 28T and suspended plaintiff's benefits based on his release to return to work and the offer of employment. Plaintiff did not file a Form 28U from Dr. Reeg, or any other physician, to establish that he was entitled to an immediate reinstatement of disability benefits.
33. Based on the greater weight of the competent evidence, the Full Commission gives greater weight to the opinions of Dr. Reeg and Dr. Richardson than to the testimony of Dr. Cox. Dr. Reeg and Dr. Richardson are board certified orthopaedic surgeons whereas Dr. Cox is a family practitioner. Further, Dr. Cox is not board certified. The Full Commission finds that the nature of plaintiff's symptoms and his complaints falls within the specialty of an orthopaedic surgeon and thereby the Dr. Richardson and Dr. Reeg are more qualified to render an opinion concerning the nature and extent of plaintiff's injuries from the automobile accident than Dr. Cox who is a primary care (family) doctor. Further, Dr. Cox opined that plaintiff's symptoms were the result of radiculopathy, but this diagnosis was negated by the EMG study that failed to confirm radicular problems. Dr. Richardson testified that plaintiff was disabled from work due to cervical spondylosis, which is a preexisting condition, and due to polyneuropathy that is not related to the automobile collision. Although Dr. Richardson stated that it was possible that the accident could have aggravated or accelerated plaintiff's conditions, it was unusual for the symptoms to occur two or three weeks after the accident as reported by plaintiff. Dr. Richardson would have anticipated the symptoms to start within hours to a day after the automobile accident.
34. The Commission notes that there is a conflict between plaintiff's testimony that he did not have symptoms until two weeks following the accident and the fact that he sought medical attention with Dr. McCarthy on April 3, 2000, and thus finds that plaintiff sought and obtained medical treatment for his symptoms ten days after the automobile accident. Although the evidence does not support the testimony of Dr. Richardson that plaintiff first began to have symptoms two to three weeks post accident, the Commission further finds that the evidence does not support the conclusion that plaintiff began to experience symptoms within hours to a day after the accident. Based on the delay in symptoms, Dr. Richardson concluded that it was not probable that the accident aggravated plaintiff's disabling conditions. Dr. Reeg gave plaintiff more of a benefit of the doubt and found that the accident aggravated plaintiff's pre-existing spondylosis, but that plaintiff reached maximum medical improvement for his compensable injury on January 19, 2001, with a 3% impairment rating to the spine. Dr. Reeg found that the compensable injury (the aggravated condition) did not preclude plaintiff's return to work. Dr. Cox found that plaintiff's neck and arm pain precluded his employment; however, the EMG study shows that these symptoms are caused by the non-compensable polyneuropathy and not by radiculopathy or aggravation of plaintiff's spondylosis or bulging disk. Dr. Reeg's opinion is supported by the EMG study performed in January, 2001, which found no indication of left cervical radiculopathy. This finding supports the conclusion that plaintiff's symptoms in January 2001 were not caused by his preexisting spondylosis or the aggravation of this condition from the automobile accident. The Full Commission, therefore, concludes that at best plaintiff suffered an aggravation of his pre-existing conditions that was temporary and not permanent.
35. The greater weight of the credible evidence shows that plaintiff had preexisting cervical spondylosis which was temporarily aggravated in the automobile accident and that plaintiff reached maximum medical improvement for that condition on January 19, 2001, sustaining a 3% impairment rating to the spine. Plaintiff's polyneuropathy is not related to the automobile collision and thereby is not compensable. Plaintiff's polyneuropathy is either idiopathic or due to alcohol abuse.
36. The "make work" jobs offered to plaintiff by defendant were not suitable employment. These positions, however, were offered during plaintiff's healing period, before he reached maximum medical improvement and while he was under the temporary restrictions placed on him by Dr. Reeg. Plaintiff was taken off from work by Dr. Cox on September 13, 2000, pending examination at Duke by Dr. Richardson. Dr. Reeg testified, and the Full Commission accepts as fact, that the compensable cervical injury did not preclude plaintiff from returning to work for defendant-employer when he reached maximum medical improvement. Based on the greater weight of the competent evidence plaintiff has failed to establish that he has sustained disability as a result of the compensable injury after he reached maximum medical improvement on January 19, 2001.
 ***********
The foregoing findings of fact and conclusions of law engender the following additional
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to his cervical spine arising out of and in the course of his employment with defendant-employer on or about March 24, 2000. Plaintiff's accident resulted in a cervical strain and a temporary aggravation of his preexisting degenerative cervical spondylosis that resulted in a temporary inability to perform the duties of his employment. N.C.G.S. § 97-2(6). Plaintiff's injury does not include his polyneuropathy.
2. As a result of his compensable injury by accident of March 24, 2000, plaintiff was totally disabled from his employment and unable to earn the same or greater wages as his pre-injury wages from August 26, 2000, through September 10, 2000, and from September 13, 2000, until January 19, 2001, when he reached maximum medical improvement. N.C.G.S. § 97-29. Plaintiff is entitled to temporary total disability benefits payable by the defendants at the rate of $428.35 per week from August 26, 2000, through September 10, 2000, and from September 13, 2000, until January 19, 2001. N.C.G.S. § 97-29.
3. Plaintiff reached maximum medical improvement for his compensable injury on January 19, 2001, with a 3% impairment rating to the spine. Plaintiff is entitled to receive nine (9) weeks of compensation at the rate of $428.35 per week. N.C.G.S. § 97-31(23). Plaintiff has failed to establish disability due to the compensable injury (as opposed to his non-compensable polyneuropathy) after he reached maximum medical improvement. See Sims v. Charms/Arby's Roast Beef, 142 N.C. App. 154,542 S.E.2d 277, rev. denied, 353 N.C. 729, 550 S.E.2d 782 (2001).
4. Plaintiff is entitled to payment of all medical expenses incurred as a result of his compensable injury by accident as are necessary to effect a cure, provide relief, or lessen his period of disability, subject to Section 97-25.1. N.C.G.S. § 97-25. Plaintiff is not entitled to medical care for his non-compensable polyneuropathy. Plaintiff's EMG failed to reveal cervical neuropathy and suggests that the aggravation to plaintiff's cervical condition was temporary. No competent medical evidence was provided to suggest that plaintiff is in need of continuing care for his compensable injuries.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. For his continuing temporary total disability compensation, defendants shall pay plaintiff at the rate of $428.35 per week from August 26, 2000, through September 10, 2000, and from September 13, 2000, to January 19, 2001. These benefits have accrued and shall be paid to plaintiff in a lump sum, subject to a reasonable attorney fee, approved in Paragraph 3.
2. Defendants shall pay plaintiff nine (9) weeks of benefits, at the rate of $428.35 for his impairment rating. These benefits have accrued and shall be paid to plaintiff in a lump sum, subject to a reasonable attorney fee, approved in Paragraph 3.
3. A reasonable attorney fee in the amount of twenty-five percent of the compensation due plaintiff under Paragraphs 1 and 2 of this AWARD is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the lump sum compensation due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel.
4. To the extent that the same is reasonably designed to effect a cure, give relief or lessen the period of disability, defendants shall pay all medical expenses incurred by plaintiff as a result of his compensable injury. Payment shall be made when bills for the same shall have been submitted to the Industrial Commission for approval.
5. Defendants shall bear the costs.
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER